**\*\*E-filed 4/4/12\*\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

RON E. REYNOLDS,

    Plaintiff,

v.

CITY AND COUNTY OF SAN FRANCISCO, et al.,

    Defendants.

No. C 09-0301 RS

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff Ron E. Reynolds is a longtime San Francisco Police Department officer, holding the "dual rank" of Inspector and Sergeant. He contends that while assigned to the department's Sex Crimes unit in 2006, as a straight male, he became the target of animosity from a lesbian fellow Inspector. Reynolds believes that animosity was the result of his status as a straight male. Reynolds alleges that the supervisor of the unit, also a lesbian, tacitly condoned, or at least failed to stop, harassment based on his sex and sexual orientation. Reynolds further alleges that he ultimately suffered adverse employment actions after being transferred out of the Sex Crimes unit, which he contends flowed from the discrimination and harassment he encountered from lesbian coworkers and his supervisor in the unit. In a related claim, Reynolds also charges that a lesbian coworker unlawfully tape recorded his side of a telephone conversation he was engaged in with a suspect.

Defendants' motion for summary judgment is well-taken. The undisputed facts demonstrate that Reynolds was transferred out of the Sex Crimes unit for legitimate, non-discriminatory reasons divorced from the alleged attitudes held towards him by his coworkers or supervisor, and that there is no evidence of any subsequent adverse employment action resulting from discriminatory motives. His claims related to the tape recording of the phone call similarly fail because the undisputed facts demonstrate he had no reasonable expectation of privacy in a work related telephone call conducted at his desk in an open office space.

## II.  BACKGROUND

Reynolds was initially hired by the City and County of San Francisco as a police officer in 1983. He was promoted to a dual rank of Sergeant and Inspector in 1991. In 1999, he was transferred to the Sex Crimes unit. There, he encountered a coworker, Inspector Dolly Casazza, who is openly lesbian. Reynolds contends he began to endure frequent insults from Casazza, who referred to him as "crazy", "goofy", "nuts" "pervert", and "Dr. Laura".[1] Reynolds complained to the Officer in Charge of the unit at the time, Lieutenant Belinda Kerr. Reynolds was satisfied with Kerr's response, as Casazza was instructed to refrain from such behavior, and did so.

In 2004, however, Kerr was replaced as Officer in Charge by Lieutenant Molly Pengel, who also is openly lesbian. Reynolds alleges that Casazza's harassment of him resumed and escalated, and that Pengel failed to put a stop to it. Reynolds claims Casazza spread various false rumors regarding him and his job performance, and accused him of professionally inappropriate behavior and incompetence. Pengel allegedly exhibited a strong dislike of Reynolds, and effectively stopped communicating with him.

On a Friday in April of 2006, Reynolds received a telephone call from a suspect in a case to which he had been assigned. Reynolds took the call at his desk, which is situated in a large, open

---

[1] The evidence shows that numerous of Reynolds's colleagues, including males, used the "Dr. Laura" moniker for him, and that it had not originated with Casazza. Apparently it was a reference to a perception that Reynolds conversations with victims included aspects of counseling and advice. At least when the term was used by Casazza, however, Reynolds contends it conveyed the implication that he was a "right-wing and homophobic enemy."

2

room where other inspectors have desks nearby. Inspector Sydney Laws, also openly lesbian, overheard the conversation from her desk, some distance across the room. Contending she was concerned about the substance of the discussion, she turned on a tape recorder on her desk to record Reynolds's side of the conversation and then temporarily left the room.[2]

The following Monday, Laws turned in the tape recording to Pengel, who in turn passed it to Captain Kevin Cashman, the Commanding Officer of the Investigations Bureau. An investigation by the Management Control Division ("MCD") followed, inquiring into whether Reynolds had improperly disclosed information to the stalking suspect. When that investigation concluded nearly a year later, Reynolds received a five day suspension for having communicated both with the stalking suspect and the suspect's therapist in a manner found to have been improper.

In the meantime, however, Reynolds had been transferred out of the Sex Crimes unit. The transfer was recommended by Cashman, and approved by Police Chief Heather Fong, as a response to written complaints received from the San Francisco District Attorney's office regarding Reynolds handling of certain cases under investigation, and his performance as a trial witness. Reynolds has since been transferred twice, and is currently serving as a patrol officer in the Richmond district. Although Reynolds has suffered no reduction in rank or pay, he contends his current assignment is substantially less desirable and that his career effectively has been destroyed as the result of the concerted efforts of his lesbian former coworkers in the Sex Crimes unit.

### III. LEGAL STANDARD

Summary judgment is proper "if the pleadings and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). The moving party "always bears the initial responsibility of

---

[2] Based on sounds he contends are discernable in the recording, Reynolds speculates that Laws crossed the room and surreptitiously slid the recorder under his desk. Any disputes as to exactly where Laws placed or left the recorder, however, are not material to the analysis herein.

3

informing the district court of the basis for its motion, and identifying those portions of the pleadings and admissions on file, together with the affidavits, if any which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (citations and internal quotation marks omitted). If it meets this burden, the moving party is then entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which he bears the burden of proof at trial. *Id.* at 322-23.

The non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party cannot defeat the moving party's properly supported motion for summary judgment simply by alleging some factual dispute between the parties. To preclude the entry of summary judgment, the non-moving party must bring forth material facts, *i.e.*, "facts that might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588 (1986).

The court must draw all reasonable inferences in favor of the non-moving party, including questions of credibility and of the weight to be accorded particular evidence. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496 (1991) (*citing Anderson*, 477 U.S. at 255); *Matsushita*, 475 U.S. at 588 (1986). It is the court's responsibility "to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence." *T.W. Elec. Service v. Pacific Elec. Contractors*, 809 F.2d 626, 631 (9th Cir. 1987). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

IV. DISCUSSION

A. Discrimination

Under the familiar *McDonnell-Douglas* framework,[3] Reynolds bears the initial burden of making out a *prima facia* case of discrimination. Defendants contend Reynolds cannot meet that burden here because (1) his transfer out of the Sex Crimes unit was not based on his sex or sexual orientation, and (2) he cannot show anything that "materially affected the terms and conditions of his employment" that would constitute an actionable adverse employment action in any event. *See Yanowitz v. L'Oreal USA, Inc*. 36 Cal.4th 1028, 1054-55 (2005) ("Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of [FEHA]").

When Reynolds brought this action, it apparently was his belief that his transfer out of the Sex Crimes unit resulted from the initiation of the MCD investigation into his phone call with the stalking suspect. Defendants vigorously contend there is nothing but Reynolds's unfounded speculation that the investigation was motivated by discriminatory animus. Even assuming there were a triable issue of fact in that regard, however, there is no dispute that Reynolds's transfer was in fact the result of the complaints lodged by members of the district attorney's office, as to whom Reynolds has identified no discriminatory intent. The decision that a transfer was the appropriate response to those complaints was made by Captain Cashman, and endorsed by Chief Fong. Reynolds has pointed to no evidence that Lt. Pengel had any role in making the decision, beyond

---

[3] *See McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-803 (1973). Although Reynolds has framed his claims under the California Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code, §§12900 et seq., "[b]ecause of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent," including *McDonnell-Douglas. Guz v. Bechtel Nat'l, Inc*., 24 Cal.4th 317, 354 (2000).

5

1 having forwarded the district attorney's complaints to Cashman, which he does not suggest was
2 inappropriate.

3    Reynolds faults Pengel for not having brought the district attorney's complaints to his
4 attention, or for giving him the additional training recommended in those memos.  Nevertheless, he
5 has offered no evidence that his transfer out of the Sex Crimes unit was based on anything other
6 than the complaints from the district attorney's office.  Indeed, Reynolds effectively concedes that
7 discovery has shown his initial transfer out of the Sex Crimes unit was for non-discriminatory
8 reasons.

9    Instead, Reynolds now argues that the transfer was only *temporary*, and that the adverse
10 employment action on which his claim is based is an alleged *permanent* "demotion" and transfer out
11 of the department's investigations bureau.  He asserts, "As a result of the discipline following the
12 illegal tape recording of Plaintiff by Sidney Laws, Plaintiff has been permanently transferred out of
13 the SFPD investigations bureau, he has lost overtime opportunities, lost his POST training
14 certificate and the corresponding income ($5,000), he has lost opportunities to promote, lost future
15 employment opportunities, and instead of the prestige of being an investigator working individual
16 cases, Plaintiff now works patrol in Richmond district where he deals on a daily basis with the same
17 unwanted, physical, dangerous, and menial tasks that are usually reserved and given to graduates out
18 of the academy." Opposition at 14:20-26.  Reynolds, however, has offered no evidence as to when
19 or why any such "demotion" or transfer became permanent.  He relies on a letter dated April 4, 2007
20 from the office of Chief Fong notifying him of the discipline to be imposed in connection with the
21 investigation of his communications with the stalking suspect and the suspect's therapist.  That
22 letter, however, refers only to a temporary suspension, and does not suggest any demotion or
23 transfer, permanent or otherwise.[4]

---

[4] As alleged in the Third Amended Complaint, Reynolds's primary theory is that the consequences he allegedly suffered after his "temporary" transfer out of the Sex Crimes unit were the result of a campaign of retaliation against him for violating an unwritten "code of silence," by reporting various alleged violations of law by fellow officers, including matters occurring after his transfer. Claims arising from these allegations were previously dismissed for his failure to exhaust administrative remedies.  While not dispositive given that adverse employment actions theoretically could result from more than one cause, these allegations further undermine Reynolds's present

6

Accordingly, the undisputed facts establish that Reynolds's initial transfer out of the Sex Crimes unit was unconnected to any of the matters he contends demonstrate possible discriminatory animus. As there is also no evidence that the events he now contends constitute adverse employment actions flowed from the allegedly discriminatory investigation into his contacts with the stalking suspect, his discrimination claims fail, and defendants' motion must be granted as to those claims.

### B. Harassment

To survive summary judgment on his claims of harassment and failure to prevent the creation of a hostile environment, Reynolds must show a genuine factual dispute as to: (1) whether a reasonable person would find the workplace so objectively and subjectively hostile toward straight males as to create an abusive working environment; and (2) whether the defendants failed to take adequate remedial and disciplinary action. *See Davis v. Team Elec. Co.,* 520 F.3d 1080, 1095 (9th Cir. 2008). Simple teasing, offhand comments, and isolated incidents (unless extremely serious) do not constitute a hostile or abusive work environment. *Id.* Moreover, "[t]he conduct must constitute discrimination *because of sex.*" *Id.* (citing *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998) (emphasis added). As the Supreme Court noted in *Oncale*, "We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations." 523 U.S. at 80.

Under these standards, a reasonable trier of fact could not find that Reynolds was subjected to unlawful harassment or that defendants failed to take appropriate steps to prevent a hostile work environment. While Reynolds's testimony supports an inference that Casazza, and perhaps Pengel as well, strongly disliked him, his contention that he was treated differently based on his sex or sexual orientation is wholly speculative, and unsupported by any other facts that might suggest such an animus. Additionally, Reynolds's assertions that he repeatedly complained of Casazza's behavior fall short of creating a basis on which to conclude that Pengel had reason to understand

---

argument (which is otherwise unsupported) that he suffered a "permanent" transfer or demotion as a result of the investigation into his contacts with the stalking suspect.

7

**United States District Court**
For the Northern District of California

that sex or sexual orientation harassment was taking place, yet failed to take appropriate remedial measures.

As *Oncale* observed, the antidiscrimination laws are not intended as a "general civility code" for the workplace. The evidence to which Reynolds points does not suggest he endured pervasive circumstances so objectively and subjectively hostile toward straight males as to create an abusive working environment. Accordingly, defendants' motion must be granted as to his claims based on harassment.

C. Taping of telephone call

Reynolds contends that the tape recording of his side of the telephone conversation with the stalking suspect violated 18 U.S.C. § 2511(1)(a) and Cal. Penal Code § 632.[5] Under either provision, Inspector Law's tape recording of Reynolds's side of the conversation is not actionable unless he had a reasonable expectation of privacy. *See Siripongs v. Calderon*, 35 F.3d 1308, 1320 (9th Cir. 1994) (federal statute not implicated by tape recording of one side of phone call unless speaker had "reasonable expectation that his communication would not be overheard."); Cal. Penal Code § 632(c) ("The term "confidential communication" includes any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering . . . or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded.")

Courts in this Circuit have looked to a number of factors to determine whether a reasonable person would possess an expectation of privacy in an oral conversation, including the "nature of the location where the[] conversation[] w[as] seized," *United States v. Gonzalez, Inc.*, 412 F.3d

---

[5] Reynolds's opposition brief also argues that Inspector Laws failed to obtain authorization under Penal Code § 629.50 for what is colloquially known as a "wiretap." As set out in a prior order filed October 11, 2011, Reynolds's claims under § 629.50 were dismissed without leave to amend, because the facts he alleged do not implicate that section. *See also* Order filed October 30, 2009 at 9:13-14 (dismissing same claim, with leave to amend, because, "us[ing] a tape recorder to record, through the air, plaintiff's side of his conversation with the suspect . . . is not proscribed by [§629.50].")

1102,1116 (9th Cir. 2005) (holding corporate officers of company had reasonable expectation of privacy with respect to conversations made in the small corporate office over which they exercised full access); whether the conversation could be overheard with the naked ear, *Kemp v. Block*, 607 F.Supp. 1262, 1263-64 (D. Nev. 1985); whether the conversation took place out in the open, *Siripongs*, 35 F.3d at 1320 (holding the telephone conversation conducted in the middle of a police department was not protected); and whether the conversation involved business or private matters, *see Medical Lab. Mgmt. Consultants v. Am. Broad. Co., Inc.*, 306 F.3d 806, 814 (9th Cir. 2002)(finding plaintiff's discussion of business operations and corporate-related topics rather than personal and private affairs does not create a reasonable expectation of privacy in the contents of the conversation); *see also Kee v. City of Rowlett*, 247 F.3d 206, 213-15 (5th Cir. 2001) (holding that factors to consider are: "(1) the volume of the communication or conversation; (2) the proximity or potential of other individuals to overhear the conversation; (3) the potential for communications to be reported; (4) the affirmative actions taken by the speakers to shield their privacy; (5) the need for technological enhancements to hear the communications; and (6) the place or location of the oral communications as it relates to the subjective expectations of the individuals who are communicating.").

In a prior motion to dismiss, the judge then-presiding over this matter observed that even looking only to the facts alleged in the complaint, it was a "close issue" as to whether the requisite expectation of privacy could be found here. *See* October 30, 2009 Order at 8:1-4. Now, on a developed factual record, it is clear that it cannot be. At the outset, the telephone call in question related to police business and Reynolds engaged in the conversation from his desk, on police premises.[6] While there is some dispute as to whether Reynolds was or should have been aware that

---

[6] Standing alone, this would not defeat a possible expectation of privacy. *See United States v. McIntyre,* 582 F.2d 1221, 1224 (9th Cir. 1978) ("A police officer is not, by virtue of his profession, deprived of the protection of the Constitution . . . This protection extends to warrantless eavesdropping to overhear conversation from an official's desk and office.") It is, however, a relevant factor. *See Medical Lab. Mgmt.,* 306 F.3d at 818 (holding that an individual "could have no reasonable expectation of limited privacy in a workplace interaction with three strangers that was purely professional and touched upon nothing private and personal to [the individual] himself."). Additionally, here Reynolds's conversation occurred in an open workspace shared by several officers, not in a separate, individual, office, as in *McIntyre*.

others actually were present in the shared office space during some portions of the call, he does not contend it would have been unusual for others to enter the room at that particular time of day. Reynolds acknowledges that when privacy was particularly important to him, he could and would take telephone calls in a more private area. It is undisputed Reynolds was aware of complaints by his coworkers regarding his loud telephone speaking voice, to the point that they found it distracting.  Reynolds also concedes that immediately upon the conclusion of the phone conversation, he discussed some its contents with a fellow officer seated nearby.

Under all of these circumstances, no reasonable trier of fact could conclude that Reynolds retained an expectation of privacy in his conversation with the stalking suspect that was reasonable, from either a subjective or objective perspective.[7]  Accordingly, summary judgment must enter against him on his claims arising from alleged violations of 18 U.S.C. § 2511(1)(a) and Cal. Penal Code § 632.

### D.  POBRA

Reynolds brings the fourth count of the Third Amended Complaint under California's Public Safety Officers Procedural Bill of Rights Act, Cal. Govt. Code §§3300 *et seq.* ("POBRA").[8]  This claim appears to relate primarily to Reynolds's allegations that he suffered retaliatory discipline for having reported various alleged violations of law occurring within the police department.  *See* Cal. Govt. Code §3304(a) ("No public safety officer shall be subjected to punitive action, or denied promotion, or be threatened with any such treatment, because of the lawful exercise of the rights granted under this chapter, or the exercise of any rights under any existing administrative grievance

---

[7] Section 632 of the California Penal Code applies when *any* of the parties to a conversation has a reasonable expectation of privacy.  Given that the stalking suspect's side of the conversation was not recorded, however, that likely is irrelevant.  Moreover, Reynolds offers no evidence or argument that the stalking suspect had an expectation of privacy with respect to this call.  Indeed, Reynolds admits it would have been permissible for him to tape both sides of the conversation.

[8] In several places in both the complaint and the opposition to this motion, Reynolds cites to purported sections of the California Penal Code when discussing POBRA.  It is apparent that those citations were intended to refer to the Government Code sections bearing the same numbers.

procedure."). As Reynolds's underlying "whistleblower" claims have previously been dismissed, any remaining scope of this claim is necessarily much narrower.

Reynolds contends his claim under subdivision (d) of section 3304 is still viable because, in his view, it prohibits *any* investigation or imposition of discipline absent a good faith belief of misconduct, regardless of whether it arose in a retaliatory context. That subdivision, however, provides a *procedural* protection, not a substantive one. In pertinent part, it provides, "no punitive action, nor denial of promotion on grounds other than merit, shall be undertaken for any act, omission, or other allegation of misconduct *if the investigation of the allegation is not completed within one year of the public agency's discovery by a person authorized to initiate an investigation of the allegation of an act, omission, or other misconduct*." (Emphasis added.) By omitting the emphasized language from the quotations in his complaint and his opposition brief, Reynolds mischaracterizes the import of the subdivision.

Defendants have established as a matter of undisputed fact that no violation of §3304(d) occurred, because the investigation regarding Reynolds communications with the stalking suspect was completed, and he was notified of the discipline to be imposed, within one year of the date Inspector Laws provided the recording to Lt. Pengel. Reynolds's opposition to this motion offers no argument to the contrary, focusing instead on rebutting defendants' alternative argument that he waived any POBRA claim by not contesting the discipline. Even assuming Reynolds is correct that the circumstances would not support a finding of waiver, the claim fails on the merits. Accordingly, defendants' motion must be granted as to this claim as well.

## V.  CONCLUSION

Defendants' motion for summary judgment is granted. A separate judgment will enter.

IT IS SO ORDERED.

Dated: 3/30/12

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

11